Robert B. Sykes (#3180)
C. Peter Sorensen (#16728)
Christina D. Isom (#17244)
**SYKES MCALLISTER LAW OFFICES, PLLC**
311 S. State Street, Suite 240
Salt Lake City, Utah 84111
Telephone No. (801) 533-0222
bob@sykesmcallisterlaw.com
pete@sykesmcallisterlaw.com
christina@sykesmcallisterlaw.com
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| DANYALE BLACKMORE and VINCENT BLACKMORE, | **COMPLAINT AND JURY DEMAND** |
| Plaintiffs, | |
| vs. | |
| HURRICANE CITY, by and through its Administrators and its Police Department; LYNN EXCELL, Chief of the Hurricane City Police Department; JARED CARLSON, a former Hurricane City Police Officer; NANETTE BILLINGS, Mayor of Hurricane City; UTAH LOCAL GOVERNMENTS TRUST; STEVEN HANSEN; and JOHN and JANE DOES 1-10, | Civil No. _____  Judge _____ |
| Defendants. | |

Plaintiffs Vincent Blackmore and Danyale Blackmore ("Blackmores"),

through counsel, complain against Defendants as follows:

1

## PRELIMINARY STATEMENT

The following allegations are based upon the undersigned's understanding of the information presently available and/or reasonably inferable from the facts. This is a civil rights action in which the Plaintiffs seek relief for Defendants' violation of their rights guaranteed by the United States Constitution, specifically the First and Fourth Amendments. These rights are further secured by the Civil Rights Act of 1871, codified as 42 U.S.C. § 1983 and § 1988.

## JURISDICTION AND VENUE

1.      This action arises under the United States Constitution and federal law, particularly under the provisions of the First and Fourth Amendments to the Constitution of the United States, and 42 U.S.C. §§ 1983 and 1988.

2.      This action seeks redress for violations of the civil rights laws of the United States, and jurisdiction is therefore invoked pursuant to 28 U.S.C. §1343 and 42 U.S.C. §1983.

3.      The claims made in this Complaint occurred and arose in the Central District of the State of Utah. Venue for the federal claims is therefore proper under 28 U.S.C. §§ 1391 and 1331.

4.      Plaintiffs are seeking damages pursuant to the claims for relief specified below in amounts to be proved at trial.

5.      This Court has authority to award costs and attorney fees pursuant to 42 U.S.C. §1988, and pursuant to the Court's inherent power under State law.

## PARTIES & STATE ACTORS

6.     Plaintiff **Danyale Blackmore** ("Danyale") is a resident of Virgin, Washington County, Utah. Danyale and her husband, Vincent Blackmore, are prominent citizens of Washington County, Utah.  They are also the owners of the My Place Hotel in Hurricane City and are prominent developers of single-family homes and real estate projects in and around Hurricane.

7.     Plaintiff **Vincent Blackmore** ("Vince") is a resident of Virgin, Washington County, Utah.  Vince is a real estate developer, home builder, contractor and a prominent citizen of Washington County. He and his wife, Danyale Blackmore, own the My Place Hotel in Hurricane City, have built many homes and developed many properties in and around Hurricane.

8.     Defendant **Hurricane City** ("Hurricane," "Hurricane City," or "the City") is a political subdivision of the State of Utah.  Hurricane is governed under a Council-Mayor form of government (UCA §10-3b-201, et. seq.). The Mayor is the chief executive officer of Hurricane and is responsible for all executive operations of the city, including the City Attorney and Prosecutor's Office, the Hurricane City Police Department ("HCPD"), and any John and Jane Does who may work for Hurricane City and the HCPD. The Mayor appoints the City Manager with the consent of the City Council. Additionally, HCPD is authorized to operate by Hurricane City and the State of Utah.  Hurricane City funds and supervises the HCPD and is legally responsible for the acts of its employees, officers and John and Jane Does who act within the course and scope of their employment.

Hurricane City, through the actions of the Defendants, including Mayor Billings, Chief Excell, HCPD Officer Carlson, and John and Jane Does, is collectively a "person" within the meaning of 42 U.S.C. § 1983. From time to time, these aforementioned Defendants, including the John and Jane Does, will be referred to herein as "the Hurricane Defendants."

9.      The **"John and Jane Does 1-10"** are other Defendants who are employees or agents of Hurricane City, the HCPD and/or other Defendants, who were acting for and on behalf of the other named Defendants and are responsible for the violations of rights identified herein. As their names become known through discovery, they may be added as named Defendants. The terms "Hurricane City Defendants," "Hurricane Defendants," or "Hurricane" therefore include these unknown "John and Jane Does 1-10 Defendants."

10.     The **Utah Local Governments Trust** ("ULGT") is the insurer for Hurricane City and Defendants Excell, Carlson and Billings ("these Defendants"). ULGT's CEO is Defendant **Steven Hansen.** If an officer like Carlson or any of these Defendants is sued for a §1983 violation, ULGT hires and pays for counsel to defend these Defendants and the City. ULGT would also initially pay any judgment against these Defendants.

11.     Defendant **Lynn Excell** ("Excell") was at all relevant times herein the Police Chief of the Hurricane City Police Department ("HCPD"), a department of Hurricane City. During all relevant times, he acted as the final policymaker for the HCPD, operating in the course and scope of his employment, and under the color and guise of the laws of the State of Utah. Excell was a major force in initiating, maintaining and continuing

the improper and malicious prosecution of Danyale without probable cause. Excell was also a major force in crafting and implementing a plan to punish or retaliate against Blackmores for their speech.

12.    Defendant **Jared Carlson** ("Carlson") was at all relevant times herein an officer employed by the HCPD, and was operating in the course and scope of his employment and under the color and guise of the laws of the State of Utah. Carlson was a major force in initiating and implementing the malicious prosecution outlined herein. He likewise may have contributed to the efforts to punish or retaliate against Blackmores for their speech.

13.    Defendant **Nanette Billings** ("Billings") was at all relevant times herein a member of the Hurricane City Council or Mayor of Hurricane City, having been elected as Mayor in 2021. Since 2021, Billings has served as the chief executive of Hurricane City. She presides over City Council meetings and is the City's chief executive and final policymaker. At all relevant times, Billings operated in the scope of her responsibilities as an elected official of Hurricane City and under the color and guise of the laws of the State of Utah. Billings was a major force in causing Hurricane to maintain and continue the malicious prosecution despite knowledge that the continued prosecution was unjustified. Billings was also a major force in crafting and implementing a plan to punish or retaliate against Blackmores for their speech.

14.    Attorney **Greg Hoole** is not a party, but played a major role in the events of the malicious prosecution. Hoole was hired and instructed by ULGT and Hansen

to defend the 2021 Federal Case against Carlson and Eric DeMille. ULGT, through Hansen and others at ULGT, directed Hoole to assist, control and ultimately direct the malicious prosecution against Danyale in order to reduce or eliminate any possible §1983 and §1988 liability against Hurricane City and Officers Carlson and DeMille. In doing these and other actions as outlined in this Complaint, ULGT, Hoole and Hansen became "State actors" under law.

## **FACTUAL ALLEGATIONS**

15.    This action arises in part out of the warrantless arrest of Danyale Blackmore without probable cause by HCPD Officer Jared Carlson at approximately 1:30 am on January 6, 2020.

16.    Carlson transported Danyale to the Purgatory Correctional Facility (**"Purgatory"**).

17.    Approximately thirty (30) minutes after arrival at Purgatory, Carlson filed a "Warrantless Arrest Probable Cause Statement" ("PCS"). Exhibit 1.

18.    The PCS contained approximately twenty falsehoods and material omissions.

19.    Based on Carlson's PCS, Hurricane City charged Danyale with the crimes of (1) Disorderly Conduct, an infraction; and (2) Interference with Arresting Officer, a Class B Misdemeanor. Exhibit 2.

20.    This malicious prosecution action arises in part out of continuing and maintaining the prosecution of Danyale by Hurricane City, Carlson, Excell, Billings, and

the Hurricane Defendants, based on their anger and malice toward, and desire to retaliate against, Vince and Danyale Blackmore.

21.     The anger, malice and retaliatory motives of the Hurricane Defendants arose out of prior interactions between Blackmores and Hurricane City officials regarding the development of a housing subdivision project called "Zions Gate."

22.     In 2018, Vince, Hurricane and the Utah Association of Municipal Power Systems ("UAMPS") became engaged in a "Guy Wire Dispute" regarding a guy wire easement on Lot 55, a housing lot located at Zions Gate ("the Property").

23.     Additionally, Hurricane and UAMPS conspired to extort the Blackmores into paying for a metal power pole (the "Power Pole Dispute") as a condition of approving further development in Zions Gate.

24.     Hurricane, as well as UAMPS, were trying to take unfair advantage of the Blackmores and their companies.

25.     Hurricane was threatening to halt or impede the further development of Zions Gate as well as to deny power to Lot 55 if Blackmores did not commit to pay for installation of the freestanding power pole near Lot 55 (the "Power Pole Dispute").

26.     Between 2018 and 2019, Vince attended multiple meetings of the Hurricane City Council and otherwise communicated with multiple Hurricane employees, including most of the Hurricane Defendants, regarding both Disputes.

27.     At this time, Mayor Billings was a member of the Hurricane City Council and usually in attendance at those meetings.

28.     Vince voiced a variety of grievances including what he believed were illegal actions by Hurricane and its personnel involving these ongoing Disputes.

29.     Vince also attended multiple Executive Sessions of the Hurricane City Council, at which Billings was in attendance, and voiced his same concerns about the ongoing Disputes.

30.     Vince repeatedly attended meetings, made visits, complained, and sent emails and letters to individual members of the City Council, as well as various City employees, including Billings, regarding the improper actions of Hurricane City.

31.     Vince voiced his concerns to multiple other Hurricane officials and employees, including Kaden DeMille, who was the City Manager and responsible for the interactions between Hurricane officials and UAMPS.

32.     In the two years prior to the January 6, 2020 arrest of Danyale, Vince and Danyale had become a figurative "thorn in the side" to Hurricane City, the Hurricane Defendants, and UAMPS because of Blackmores' efforts to resolve the ongoing Disputes.

33.     On December 4, 2018, Hurricane City sent Danyale an e-mail stating that it was withholding power to the Property until the Disputes with UAMPS were resolved. Exhibit 3.

34.     At the same time, Hurricane City also denied an occupancy permit for the finished house on Lot 55 until the Power Pole Dispute with UAMPS was resolved, meaning until Blackmores paid the extorted amount for the pole.

**35.**    On December 17, 2018, UAMPS initiated a lawsuit against Vince and his development companies.

**36.**    In early 2019, Hurricane City, in retaliation, held up occupancy approvals for Blackmore's Hurricane My Place Hotel ("Hotel"), which had nothing to do with the Guy Wire and Power Pole Disputes.

**37.**    Finally, Hurricane City approved occupancy and the Hotel opened in mid-2019.

**38.**    In December 2019, Vince and Zions Gate sent a Notice of Claim to Hurricane City and UAMPS for their actions regarding the Property. Exhibit 4.

**39.**    On January 6, 2020, HCPD Officer Carlson was dispatched to the Hotel for a "citizen assist" call from **Brett Brangham,** who had locked himself out of his hotel room.

**40.**    Officer Carlson was not dispatched to the Hotel based on suspicion that a crime had been committed or that one was in the process of being committed.

**41.**    Upon arrival at the Hotel, Carlson was met by Brangham who claimed he was locked out because he had left his key in his room when he went outside the Hotel to smoke.

**42.**    Carlson was assisted that morning by HCPD Officer Eric DeMille.

**43.**    The Hotel parking lot is on the north side of the Hotel. Entrance to the building was a southward walk through two sets of sliding glass doors. Both sets of sliding glass doors slid east to west to allow passage.

44.     There is an approximately 8-foot deep by 10-foot wide interior breezeway between the outer and inner sliding doors.

45.     A phone on the east wall of the breezeway allowed a locked-out guest to call Hotel management after hours if the guest did not have a key which allowed entry.

46.     A sign near the phone explained how to gain entry after hours.

47.     On January 5, 2020, after approximately 11:00 p.m., the lobby was closed and locked to the public.

48.     After that time, there was no public access and guests would need a key to get into the lobby, or need to use the phone in the breezeway to call for assistance.

49.     Before Carlson and DeMille arrived, Brangham, in order to get into the lobby, had kicked in and damaged the interior sliding door, so that it was stuck at a right angle to the correct slide path.

50.     Carlson, DeMille and Brangham entered the Hotel at approximately 1:30 am on January 6, 2020, through the sliding front doors of the Hotel into the lobby area.

51.     As they passed through the first or outside sliding door, Carlson saw the telephone in the breezeway between the two sets of sliding doors. There was a sign directing guests and others to call "0" if they needed assistance from the Hotel management.

52.     As they passed through the second sliding door, Carlson observed that it was damaged, i.e., was askew at a right angle to the east-west slide path.

53.    When asked by Carlson, Brangham admitted that he had damaged the _locked_ sliding door by kicking it inward to a right angle to the normal slide path.

54.    Although Carlson knew that Brangham had damaged the second sliding front door by kicking it off the slide path, he took no action to investigate criminal mischief or question him.

55.    Carlson used a lobby phone to call Hotel management for assistance.

56.    Danyale, an owner of the Hotel, was on duty but had retired earlier to the third floor. She answered Carlson's call.

57.    Carlson asked Danyale to come to the lobby. Carlson Body Cam (CBC) 01:37:22.

58.    Carlson claimed he wanted to finish a "citizen assist" call and leave the Hotel. CBC 01:39:27

59.    Carlson hung up on Danyale at CBC 01:39:43 and told Officer DeMille that Danyale "cussed" at him and that she had refused to come down to the lobby to assist the Officers.

60.    Carlson was angry at Danyale for allegedly cussing and refusing to immediately come to the lobby.

61.    At Carlson's request, Brangham also called Danyale from the lobby phone.

62.    Brangham explained to Danyale, within hearing distance of the Officers, that he had "kicked" in the door so he could get into the *locked* lobby. CBC 01:41:31.

63.    Danyale arrived at the lobby about 2 1/2 minutes after the phone call with Carlson had ended. CBC 01:42:02.

64.    Danyale first asked that Carlson remove Brangham from the Hotel. CBC 01:42:04.

65.    At the time of this encounter, Carlson was 34 years old, weighed 225 lbs. with police gear on, was 5′10″ in height, and was in very good shape physically.

66.    DeMille was similar or comparable to Carlson in terms of age, height, weight and conditioning.

67.    Danyale was about 5′4″ and weighed about 106 lbs. at the time.

68.    Carlson knew that Danyale was the owner of the Hotel and was the manager in charge for the night. CBC 01:39:13.

69.    Carlson, as an HCPD Officer, knew or should have known about Danyale's right as an "innkeeper" to request Brangham's removal. Utah Code Ann. §29-2-103.

70.    Carlson refused Danyale's innkeeper request to remove Brangham. CBC 01:42:18.

71.    Danyale was upset because Brangham had damaged her expensive sliding door.

72.    From the time Danyale first becomes visible on Carlson's body cam as she walks east down the Hotel hallway, until Carlson lays hands on her, is about 52 seconds. CBC 01:42:00 - 01:42:52.

73.    During this 52 seconds, Danyale made no verbal threats toward Brangham or the Officers. CBC 01:42:00-01:42:52.

74.    Danyale took no aggressive physical action toward Brangham or the Officers. CBC 01:42:13-23.

75.    Danyale, under her innkeeper's privilege, asked Brangham to collect his things and immediately leave the Hotel.

76.    Danyale had no weapon.

77.    Danyale had committed no crime.

78.    Danyale asked Carlson multiple times to remove Brangham, but Carlson refused each request. CBC 01:42:18-01:42:30.

79.    Carlson *asked* Danyale to leave the lobby and go further into the hallway to the west of the lobby. CBC 01:42:28.

80.    Danyale complied. CBC 01:42:29.

81.    Danyale told Carlson that as she came down the west stairway, she had seen that the door on the west end of the hall had been propped open. CBC 01:42:33.

82.    Danyale explained that Brangham had kicked in and damaged her sliding door. CBC 01:42:40.

83.    Carlson already knew that Brangham had kicked in the _locked_ sliding door. CBC 01:40:15-31.

84.    Carlson never told Danyale to *stay* in the hallway. CBC 01:42:30-43:02.

85.    Carlson never told Danyale *not to approach* Brangham. CBC 01:42:30-43:02.

86.    After walking west from the lobby in the hallway, as requested by Carlson, Danyale *did not yell* at Brangham. CBC 01:42:30-01:42:42.

87.    Danyale *did not scream or yell at Carlson*. *Id.*

88.    Danyale told Carlson that she had "procedures" she needed to complete and began to walk back to the front desk. CBC 01:42:43.

89.    Carlson extended his arm and stepped into Danyale's way. CBC 01:42:44.

90.    Carlson "chest bumped" Danyale as she tried to walk toward the lobby. CBC 01:42:44.

91.    Danyale immediately backed away from Carlson. *Id.*

92.    Carlson then inappropriately grabbed Danyale's left breast area. CBC 01:42:45.

93.    Without warning, Carlson pushed Danyale into the elevator alcove that was next to the hallway. CBC 01:42:45.

94.     Carlson continued to extend his left hand and arm toward Danyale and aggressively advanced toward her, left hand open and left arm extended to grab her. CBC 01:42:46-48.

95.     Only 4 seconds after Carlson had pushed her into the alcove, he again laid hands on Danyale and forced her against the wall. CBC 01:42:49.

96.     Carlson and DeMille grabbed Danyale's hands and handcuffed her. CBC 01:42:50.

97.     The Officers never told Danyale she was under arrest, or warned or threatened her with arrest up to that point.  CBC 01:42:59.

98.     Danyale repeatedly asked why she was being treated this way. CBC 01:42:59.

99.     27 seconds after Carlson grabbed her, Carlson told Danyale she was "under arrest" for disobeying his "order" for her "not to approach him [Brangham]." CBC 01:43:27.

100.    Carlson's statement was false as Danyale had not approached Brangham. CBC 01:42:00-01:43:27.

101.    Carlson did not have probable cause to arrest Danyale.

102.    Carlson and DeMille then dragged Danyale through the hotel lobby. CBC 01:43:37-01:43:45.

103.    Because she was handcuffed, in socks, and short of stature, Danyale could not easily get into the back of Carlson's truck. CBC 01:44:20.

104.    While in Carlson's truck, Officer DeMille falsely told Danyale she was being arrested because she was "so damn drunk."

105.    Danyale was not intoxicated.

106.    Danyale was never charged with an alcohol related offense.

107.    After Danyale was placed in the truck in handcuffs, Carlson and DeMille *twice* turned off the audio on their body cams and had conversations lasting over two minutes. Carlson is seen laughing while the audio is off. CBC 1:44:46-01:46:07 (Carlson) and 01:44:34-01:44:55 (DeMille, Carlson laughing); CBC 1:48:20-01:50:10.

108.    Carlson took Danyale to Purgatory, the Washington County Jail, where she was placed in a holding cell.

109.    At Purgatory, Danyale was illegally strip searched in front of other male officers.

110.    At Purgatory, Carlson filled out a Probable Cause Statement ("PCS") for a warrantless arrest alleging two violations, Disorderly Conduct and Interference with Arresting Officer. Exhibit 1.

111.    Carlson filled out the PCS under oath.

112.    Carlson knowingly and intentionally made multiple material allegations which were false. These falsehoods include but are not limited to:

   a.   "She [Danyale] refused to meet with us." CBC 1:42:00 - 1:43:27.

   b.   "She [Danyale] was very confrontational and kept walking toward the male." CBC 01:42:00-01:43:27.

**c.** "I stood in between them [Danyale and Brangham]." CBC 01:42:00-01:43:27.

**d.** "She tried to walk past me toward the male as she yelled at him." CBC 01:42:00-01:43:27.

**e.** "I was concerned by her behavior that she was going to assault the male or try and force him out of the hotel." CBC 01:42:00-01:43:27.

**f.** "Danyale continued to yell and scream." CBC 01:42:00-01:43:27.

**g.** "It appeared Danyale was trying to move around me again as she continued to yell." CBC 01:42:00-01:43:27.

**h.** "Danyale pulled her arms away and tried to turn around." 01:42:59-01:43:27.

**i.** "Danyale refused to walk and pushed against me and Ofc. E. DeMille." CBC 01:43:27-01:44:20.

**j.** "When I got to my vehicle Danyale refused to enter my vehicle." *Id.*

**113.** Carlson knowingly and purposefully omitted key material facts regarding probable cause to arrest Danyale. These omissions include but are not limited to:

**a.** The front lobby door had been locked and that it was open *only* because Brangham had kicked it open. CBC 01:40:15; 01:41:31.

**b.** Brangham appeared to be impaired.

**c.** Carlson chest bumped Danyale as she tried to walk back to the front desk to start some paperwork. CBC 01:42:44.

**d.** Carlson had grabbed Danyale's breast when he pushed her into the alcove. CBC 01:42:45.

**e.** Carlson continued to aggressively advance toward Danyale with his left arm and hand fully extended to grab her. CBC 01:42:46.

    **f.**  Danyale was yelling at Carlson only because he had inappropriately grabbed her left breast and pushed her. CBC 01:42:45-01:42:49.

    **g.**  Carlson escalated the circumstances through his own actions. CBC 01:42:00-01:43:27.

**114.**    Carlson made these false statements and omissions to justify the illegal arrest without probable cause.

**115.**    A reasonable person, under the same circumstances faced by Carlson, would not have believed that probable cause existed to arrest Danyale.

**116.**    On January 6, 2020, the Hurricane City prosecutor filed criminal charges against Danyale. *City of Hurricane vs. Danyale Blackmore,* Case No. 201300009 ("Criminal Case"). Exhibit 2.

**117.**    On or about January 6, 2020, the Hurricane Defendants knew or should have known that there was no probable cause to arrest and prosecute Danyale, and to continue the prosecution.

**118.**    Hurricane Defendants used this prosecution to punish and retaliate against the Blackmores for their speech.

**119.**    ULGT, Hansen and the Hurricane Defendants used the prosecution to attempt to wrongfully convict Danyale of crimes of which she was innocent in order to reduce or avoid paying a §1983 judgment and §1988 fees to the Blackmores.

**120.**    On or about January 6, 2020, or at least shortly thereafter, Chief Excell knew or should have known that there had been no probable cause to arrest and prosecute Danyale.

**121.**　　Chief Excell scheduled a meeting with Carlson and discussed at length the details of Danyale's arrest.

**122.**　　After reviewing the bodycam footage and meeting with Carlson, Excell knew or at least doubted that Carlson had probable cause to arrest Danyale.

**123.**　　No reasonable police chief could have believed that probable cause existed to arrest and prosecute Danyale based on the videos.

**124.**　　Based upon information and belief, Chief Excell informed one or more of the Hurricane Defendants about his doubts about the lack of probable cause for the arrest.

**125.**　　Hurricane City nonetheless advised the prosecutor not to drop charges but to press forward with the prosecution.

**126.**　　In May 2020, two entities in which Vince was an owner, Benzer Development Solutions and 3 Dimensional Contractors, Inc., filed a lawsuit against Hurricane City and UAMPS regarding their interference in one of Vince's real estate developments. Exhibit 5 (title and signature pages only).

**127.**　　The lawsuit alleged improper actions by multiple Hurricane City employees.

**128.**　　On multiple occasions after Danyale's arrest, in public and private meetings with Hurricane officials, Vince publicly expressed his opinions regarding the mistakes and improper and/or illegal actions of Hurricane elected officials and employees regarding the Zions Gate real estate development, i.e., the two Disputes explained herein.

19

129.     On multiple occasions, Vince publicly expressed his opinions that Excell and the Officers were purposefully trying to intimidate him and Danyale.

130.     Based upon information and belief, Hurricane City officials, including each of the Hurricane Defendants, became angry with what Vince was saying about them and Hurricane City in public.

131.     Because of the Hurricane Defendants' anger and frustration with the Blackmores' speech, they chose to aggressively continue to prosecute the criminal charges against Danyale.

132.     Hurricane did this to retaliate against the Blackmores for their speech and teach them a lesson.

133.     Defendants pushed the prosecution of Danyale, knowing that it lacked probable cause.

134.     In January 2021, Billings was sworn in as Mayor of Hurricane City.

135.     On March 3, 2021, the Blackmores filed a civil rights lawsuit in federal court alleging, among other things, Fourth Amendment violations by Officers Carlson, DeMille, and Hurricane City ("Federal Case"). Exhibit 6 (title and signatures pages only).

136.     The Federal Case also raised various state causes of action.

137.     Based on information and belief, the Hurricane Defendants were outraged by this filing.

**138.** Attorney **Greg Hoole** ("Hoole"), of the law firm of Hoole & King, was retained by ULGT, through Hansen, to represent and defend Hurricane City, Carlson and Officer Eric DeMille.

**139.** ULGT instructed, directed, influenced, and/or controlled Hoole's actions in defending the 2021 Federal Case, either through Hansen or someone designated by Hansen to act in ULGT's behalf.

**140.** ULGT, as directed and ordered by Hansen, directed Hoole to assist, direct, and ultimately control the malicious criminal prosecution against Danyale to reduce or eliminate any possible §1983 and §1988 liability against the Hurricane Defendants.

**141.** ULGT is a governmental entity operating under Utah Code Ann. §11-13-102.

**142.** In directing Hoole and the other actions as outlined in this Complaint, ULGT and Hansen became "state actors" and therefore may be held liable for the malicious prosecution of Danyale as explained and set forth herein.

**143.** Hoole was aware of the Criminal Case and reported on it regularly to ULGT and Hansen.

**144.** On May 27, 2021, Hoole filed a Motion to Dismiss the Federal Case arguing, among other things, that Carlson and DeMille had probable cause to arrest Danyale ("MTD").

145.    On December 1, 2021, the Federal Court ruled that Carlson *did not have probable cause* to arrest Danyale on either of the charges of disorderly conduct or interference with an arresting officer. The Court held in part:

> [B]ecause the Blackmores' allegations and the Video demonstrate that the Officers ***did not have probable cause to arrest Danyale for either disorderly conduct or interference*** with a peace officer, the Blackmores have sufficiently alleged violations of Danyale's Fourth Amendment right to be free from an unlawful arrest.

Exhibit 7, Decision, Doc. 36, p. 35 (emphasis and <u>double</u> emphasis added) (title and signature pages only).

146.    Even with this adverse Motion to Dismiss ruling regarding probable cause, Hurricane, ULGT and Hansen, continued to aggressively prosecute the Criminal Case.

147.    In or about September 2021, Jared Carlson resigned from HCPD and moved to Palau, an island nation in the Pacific Ocean approximately 5,700 miles from Hurricane City.

148.    Hurricane City, Excell, Billings and other Hurricane Defendants were aware Carlson was leaving prior to September 2021.

149.    Defendants did not notify Plaintiffs' Counsel of Carlson's move until March 2022.

150.    Carlson's move to Palau delayed the Federal Case for approximately a year while Plaintiffs sought to take his deposition.

**151.**    At the Criminal Trial in January 2024, Carlson admitted that many of the "facts" he provided in the PCS were incorrect or false.

**152.**    Carlson also admitted that he omitted key, material facts in the PCS.

**153.**    Carlson's false and incomplete PCS had influenced Hurricane City's decision to file and to continue prosecuting criminal charges against Danyale.

**154.**    Hoole took a major role in the preparation and prosecution of the January 2024 Criminal Case, even though Hoole was not the Hurricane City Prosecutor and had not been deputized as a prosecutor.

**155.**    After the original Hurricane City Prosecutor had allegedly "conflicted" out of the case in July 2022, Hoole, at the request and direction of Hurricane, ULGT and Hansen, took the lead in contacting and retaining one **Michael Green** as the special prosecutor for Hurricane.

**156.**    Hoole never filed a notice of appearance in the Criminal Case.

**157.**    At the Criminal Trial, Hoole sat at the prosecution's counsel table where he directed and influenced Green on jury selection, witness questioning and cross examination.

**158.**    On multiple occasions prior to Trial, Hoole, on behalf of ULGT and Hansen, directed Green to aggressively prosecute the Criminal Case.

**159.**    Hoole, on behalf of ULGT and Hansen, told Green that losing the Criminal Case would have negative implications on the Federal Case.

**160.**    Because of these negative implications, Hoole, on behalf of Hurricane, ULGT and Hansen, told Green he *was not to settle the Criminal Case* because Hurricane, ULGT, Hoole and Hansen wanted a guilty verdict.

**161.**    Hoole, on behalf of Hurricane, ULGT and Hansen, went further than simply "advising" when he directed Green on how to prosecute the Criminal Case.

**162.**    Hoole essentially took over prosecution of the Criminal Case. Among other things, Hoole:

   **(a)**    sat at counsel table with Green even though Hoole had no official role and had not appeared in the Criminal Case;

   **(b)**    essentially took over jury selection from Green;

   **(c)**    directed Green on what questions to ask witnesses;

   **(d)**    argued the final jury instructions before the court;

   **(e)**    gave the closing argument to the jury; and

   **(f)**    gave the rebuttal argument to the jury during the closing.

**163.**    The Hurricane Defendants, from the beginning of the Criminal Case, doubted the accuracy of the allegations in Carlson's PCS.

**164.**    Hoole's level of involvement in the Criminal Case ignored the rules that require a prosecutor to be a "deputized" agent of the State of Utah.

**165.**    The Hurricane Defendants, Hansen, and the ULGT requested or demanded Hoole's involvement, as set forth above.

24

**166.**    These requests showed that Hurricane would ignore the requirements of the law to get a guilty verdict against Danyale in the Criminal Case, in order to help reduce their liability and financial exposure in the Federal Case.

**167.**    Hoole's level of involvement demonstrated a willingness by Defendants to sidestep proper procedures of criminal prosecution for the purpose of getting a guilty verdict against Danyale in the Criminal Case in order to aid Defendants' efforts to get a successful outcome in the ongoing civil rights case, and to save money and expense for ULGT.

**168.**    The Hurricane Defendants knew or should have known soon after January 6, 2020, that Carlson did not have probable cause when he arrested Danyale.

**169.**    Long after it was clear to reasonable law enforcement and public officials that there was no basis for a continued prosecution of Danyale, the Hurricane Defendants nonetheless continued the prosecution to (a) gain leverage to obtain a favorable outcome in the Federal Case and save ULGT money; and (b) intimidate and punish Vince and Danyale for their First Amendment speech and criticism of Defendants.

**170.**    The decision by Hurricane Defendants, including the Mayor, to continue the prosecution of Danyale established a Hurricane City policy which was promulgated under the direction of the Mayor and with the advice and encouragement of Defendants Excell and other Hurricane City officials and Defendants.

**171.**    Hoole, on behalf of ULGT, advised the Hurricane Defendants to continue the prosecution of the Criminal Case as leverage to dispose of the Blackmores' Federal Case and to save ULGT money.

**172.**    These actions demonstrated malice by the Hurricane Defendants against Danyale and Vince Blackmore.

**173.**    Defendants, at all times, were state actors.

**174.**    Each of the Hurricane Defendants, through the actions of the listed Defendants, knowingly, intentionally and maliciously initiated and/or continued the prosecution of Danyale for Disorderly Conduct and Interference with an Arresting Officer, even though these Defendants knew there was no probable cause to initiate, continue and/or maintain these prosecutions.

**175.**    Defendants induced, encouraged and/or caused Hurricane to embark on a course of action to punish or retaliate against the Blackmores for their First Amendment speech and to save money in the defense of the Federal Case.

**176.**    On January 24, 2024, a four-person Hurricane City jury in the Criminal Case returned a verdict of "Not guilty" on all charges that had been alleged against Danyale. *See,* Exhibit 8, Jury Verdict Form.

**177.**    The jury verdict terminated the Criminal Case in Danyale's favor.

**178.**    On June 7, 2024, the Federal Court ruled on summary judgment that, based on the evidentiary record, Officers Carlson and DeMille "***did not have*** reasonable

suspicion or ***probable cause*** to arrest Danyale for disorderly conduct." *See*, Exhibit 9, Decision, Doc. 159, p. 26 (emphasis added) (title and signature pages only).

179.    In the same ruling, the Federal Court ruled that the evidentiary record "***does*** show Blackmore was interfering with Carlson and DeMille's attempt to detain and arrest her." *Id.* (emphasis added). Plaintiff Danyale disagrees with this ruling and is appealing this aspect of the ruling to the Tenth Circuit. *See*, Tenth Circuit Case No. 24-4074.

180.    The U.S. Supreme Court explained, "the gravamen of a Fourth Amendment claim for malicious prosecution … is the ***wrongful initiation of charges without probable cause***." *Thompson v. Clark*, 596 U.S. 36, 43 (2022) (emphasis added).

181.    In *Chiaverini*, the Court further explained:

> The question presented here arises when the official brings multiple charges, only one of which lacks probable cause. Do the valid charges insulate the official from a Fourth Amendment malicious prosecution claim relating to the invalid charge? The answer is no:  The ***valid charges do not create a categorical bar***.

*Chiaverini v. City of Napoleon*, Ohio, 602 U.S. ---- (2024) (emphasis added).

## FIRST CAUSE OF ACTION

### ~ *Malicious Prosecution* ~

### *Violation of the Fourth Amendment*
### *Against All Defendants*

### Cognizable Under 42 U.S.C. § 1983

182.    The allegations contained in all other paragraphs are incorporated herein by reference.

183.    To bring a §1983 claim for malicious prosecution, plaintiffs must show:

> (1) the defendant caused the plaintiff's ***continued*** confinement or ***prosecution***; (2) the original ***action terminated in favor*** of the plaintiff; (3) ***no probable cause*** supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with ***malice***; and (5) the plaintiff sustained ***damages***.

*Mglej v. Gardner*, 974 F.3d 1151, 1170 (10th Cir. 2020) (emphasis added).

184.    To initiate the prosecution, Officer Carlson knowingly and/or recklessly supplied *false and misleading* information in his PCS to the Hurricane prosecutor, at least as follows:

      a.    Danyale refused to meet with officers in the lobby;

      b.    Danyale was confrontational and walked toward Brangham;

      c.    Officer Carlson stood between Danyale and Brangham;

      d.    Danyale tried to walk past Officer Carlson and toward Brangham;

      e.    Carlson was concerned Danyale would assault Brangham;

      **f.**     Danyale appeared to be trying to move around Carlson;

      **g.**    Danyale appeared to be returning to the lobby to assault Brangham;

      **h.**    Danyale pushed against Officer Carlson;

      **i.**     Danyale pulled her arms away and tried to turn around;

      **j.**     Danyale refused to enter the police vehicle.

*See,* ¶112 above.

      **185.**    Carlson *omitted* at least the following facts and information in his PCS:

      **a.**    The front door lobby was locked prior to Brangham kicking in the door;

      **b.**    Brangham appeared to be impaired;

      **c.**    Danyale complied with orders to step into the hallway when asked;

      **d.**    Officer Carlson inappropriately grabbed Danyale's left breast;

      **e.**    Danyale was yelling at Carlson because he had grabbed her breast;

      **f.**     Carlson had pushed Danyale aggressively;

      **g.**    Carlson escalated the situation by advancing steadily toward Danyale;

      **h.**    Carlson stretched his left hand out to grab Danyale; and

      **i.**     Danyale could not get her footing and needed help to get into Carlson's Police Truck.

*See,* ¶113 above.

      **186.**    Carlson acted with malice when he made false statements and omitted important facts to prosecutors to justify arresting Danyale.

**187.** The Federal Court, in two separate rulings, found there was no probable cause to arrest Danyale for disorderly conduct. *See*, ¶¶145 and 178, above.

**188.** No reasonable person, in similar circumstances to Carlson, would have believed there was probable cause to arrest Danyale.

**189.** Defendants, jointly and individually, caused Danyale's continued prosecution despite having seen the body cam videos and knowing that Carlson's PCS was false, misleading, exaggerated, and/or omitted material facts.

**190.** Hurricane City Defendants, as well as ULGT and Hansen, jointly and individually, knew or should have known that Carlson's PCS contained falsehoods, exaggerations, misstatements, misleading statements, and omitted key facts.

**191.** Defendant Excell is specifically responsible for the malicious prosecution for at least the following reasons:

    **a.** He knew or should have known that Carlson did not have probable cause to arrest Danyale;

    **b.** He knew that the continued prosecution was not supported by probable cause;

    **c.** He was angry at Vince and Danyale because of their public and private criticisms of HCPD and his leadership over the department;

    **d.** In retaliation, he encouraged Billings and the other Hurricane Defendants to aggressively continue the prosecution of Danyale.

**192.** Defendant Billings is specifically responsible for the malicious prosecution for at least the following reasons:

    **a.**    She knew or should have known that Carlson did not have probable cause to arrest Danyale;

    **b.**    She was angry at Vince and Danyale for their public and private criticism of her and the members of the Hurricane City Council as well as other City employees and, specifically, for their criticism of her leadership and management of the City;

    **c.**    In retaliation, she encouraged the other Hurricane Defendants to aggressively continue the prosecution of Danyale.

193.     Hurricane Defendants acted with malice when they continued to aggressively support the Criminal Case and continue the prosecution of Danyale, knowing that Carlson's PCS did not support probable cause to either initiate or continue Danyale's prosecution.

194.     Defendant Excell acted with malice when, *inter alia*, he continued to support prosecuting Danyale because he knew or should have known that Carlson's PCS did not support probable cause to either initiate or continue Danyale's prosecution.

195.     Defendant Billings acted with malice when, *inter alia*, she continued to support prosecuting Danyale because she knew or should have known that Carlson's PCS did not support probable cause to either initiate or continue Danyale's prosecution.

196.     Hurricane, ULGT and Hansen acted with malice when they continued the prosecution without probable cause.

197.     Hurricane, ULGT and Hansen acted with malice by urging and supporting the continued prosecution of Danyale after the Federal Court ruled there was no probable cause to arrest Danyale.

198.    Hurricane acted with malice when it demanded that Hoole take over the Criminal Case and act as a Hurricane City prosecutor.

199.    The Hurricane Defendants acted with malice when they retaliated against the Blackmores with continued prosecution of Danyale and the Blackmores for their First Amendment criticisms of Hurricane City and its elected officials and employees.

200.    Danyale and Vince have been damaged financially, physically and emotionally because of the malicious prosecution initiated and continued by Defendants.

201.    Danyale and Vince were required to retain criminal legal counsel to defend against the Criminal Case and the continued prosecution pursued by all Defendants.

202.    The prosecution of Danyale terminated in her favor when the jury found her not guilty of all charges on January 25, 2024, after a two-day trial. *See*, ¶176, above.

203.    Plaintiffs have been damaged by Defendants as set forth herein.

## SECOND CAUSE OF ACTION

### ~ *Retaliation for Free Speech* ~

**Violation of the First Amendment
Against All Defendants**

**Cognizable Under 42 U.S.C. §1983 and §1988**

204.    The allegations contained in all other paragraphs are incorporated herein by reference.

205.    A First Amendment retaliation claim requires a plaintiff to show:

> (1) he was engaged in ***constitutionally protected activity***, (2) the government's actions caused him injury that would ***chill a person*** of ordinary firmness from continuing to engage in that activity, and (3) the government's actions were ***substantially motivated as a response to his constitutionally protected conduct***.

*Nielander v. Board of Cty Com'rs of Cty of Republic, Kan*., 582 F.3d 1155, 1165 (10th Cir. 2009) (emphasis added).

206.    Because of Hurricane City's unfair and improper actions involving the Disputes explained above, Vince and Danyale often criticized Hurricane City officials publicly and privately beginning in July 2018 and continuing through 2023.

207.    Vince and Danyale attended multiple meetings and executive sessions of the City Council, where many of the Defendants were in attendance, and expressed their criticisms regarding how Hurricane City had illegally taken advantage of them.

208.    Criticism of Hurricane City officials, including Defendants, constituted a constitutionally protected activity under the First Amendment.

209.    The Hurricane Defendants were angry at the Blackmores because of their public and private criticisms of Defendants' actions.

210.    In December 2019, the Blackmores served a Notice of Claim on Hurricane City of their intent to sue Hurricane over its improper actions relating to the Zions Gate Disputes. *See*, Exhibit 4.

211.    On January 6, 2020, Danyale was arrested at her hotel without probable cause by Defendant Carlson.

**212.**    The PCS filed by Carlson contained multiple false statements and omissions meant to justify his unlawful arrest of Danyale. *See*, Exhibit 1.

**213.**    No reasonable person, in similar circumstances to Carlson, would have believed there was probable cause to arrest Danyale.

**214.**    Later in the day of January 6, 2020, Hurricane City filed a Criminal Case against Danyale, falsely alleging disorderly conduct and resisting arrest based on Carlson's PCS. *See*, Exhibit 2.

**215.**    From 2020-2024, the Blackmores continued their public and private criticisms of Hurricane City officials and Defendants.

**216.**    In May 2020, Vince and Danyale filed a lawsuit against Hurricane City relating to its actions at Zions Gate Development. *See*, Exhibit 5.

**217.**    In March 2021, Vince and Danyale filed a federal civil rights lawsuit against Defendants for a violation of the Fourth Amendment regarding the January 6, 2020 illegal arrest.

**218.**    Both lawsuits infuriated the Hurricane City Defendants.

**219.**    In its MTD Decision of December 2021, the Federal Court ruled that Officer Carlson did not have probable cause to arrest Danyale, which allowed the Federal Case to proceed.

**220.**    Despite this ruling, the Hurricane City Defendants pushed and otherwise supported the continued criminal prosecution against Danyale in retaliation for the Blackmores' criticisms of the Defendants.

221.    Hurricane City Defendants intended that the continued criminal prosecution of Danyale would halt, chill and/or punish the Blackmores' constitutionally protected criticisms of Hurricane City officials.

222.    The continued criminal prosecution of Danyale by the Hurricane City Defendants was substantially motivated by their anger toward and desire to retaliate against Vince and Danyale for their constitutionally protected speech.

223.    Both Vince and Danyale have been injured personally, emotionally, physically and financially because of the actions of the Hurricane Defendants.

224.    Defense against the improper and vindictive criminal prosecution has cost the Blackmores a substantial sum of money.

225.    The Hurricane City Defendants' organized effort against the Blackmores would have chilled a person of ordinary firmness from continuing to engage in protected criticisms of Hurricane City officials.

226.    The Hurricane City Defendants' retaliatory and punitive actions and practices were the cause of Plaintiffs' damages as set forth herein.

## THIRD CAUSE OF ACTION

### ~ *Abuse of Process* ~

### *Against All Defendants*

### Cognizable Under 42 U.S.C. §1983 and §1988

227.    The allegations contained in all other paragraphs are incorporated herein by reference.

**228.**    The Tenth Circuit has stated that "state law provides the starting point for a constitutional claim of. . . abuse of process." *Roska ex rel Roska v. Peterson,* 328 F.3d 1230, 1244 (10th Cir. 2003).

**229.**    Under Utah law, "abuse of process claims require that legal proceedings be instituted 'without probable cause, for the purpose of harassment or annoyance; and it is usually said to require malice.'" *Id.* at 1245.

**230.**    "[A]buse of process applies to '[o]ne who uses a legal process . . . against another primarily to accomplish a purpose for which it is not designed.'" *Hatch v. Davis,* 2004 UT App. 378, ¶33, 102 P.3d 774, 782.

**231.**    Plaintiffs must show "First, an ulterior purpose; second, an act in the use of the process not proper in the regular prosecution of the proceedings." *Id.* at ¶34.

**232.**    Hurricane Defendants, ULGT, Hansen, and John and Jane Does, abused the criminal prosecution process because a primary purpose for their continuing to pursue Danyale's prosecution was to dismiss the Federal Case and avoid paying §1983 and §1988 damages.

**233.**    Another primary purpose was to retaliate against the Blackmores for their speech.

**234.**    These primary purposes constituted ulterior and improper purposes for which the criminal prosecution was not designed.

**235.**    Hurricane also took willful and purposeful actions to delay the Federal Case so that the Criminal Case, which they hoped to win, would come to trial first.

**236.**    As directed by Hoole, ULGT and Hansen, Hurricane took willful and purposeful steps to hinder and delay the Blackmores' proper requests to depose Officer Carlson in the Federal Case.

**237.**    These willful acts delayed action in the Federal Case for at least a full year.

**238.**    These willful and purposeful acts demonstrated Hurricane's ulterior purpose in prosecuting the Criminal Case in order to gain advantage and/or dismiss the Federal Case.

**239.**    These willful acts constituted independent corroboration of the Hurricane Defendants' ulterior purpose for their abuse of the criminal prosecution process.

**240.**    These willful acts corroborate the abuse of process by the Hurricane Defendants, ULGT and Hansen.

**241.**    ULGT and Hansen (these particular Defendants) took many actions in their improper efforts to secure a conviction of Danyale Blackmore to avoid paying civil damages and attorney fees. These actions include but are not limited to the following:

    **a.**    Paid and directed Hoole to give information and support to Hurricane City and its prosecutors to secure an unjust and unconstitutional conviction.

    **b.**    Encouraged and directed Hoole and Hurricane City to obtain a new prosecutor they could more easily direct and control in order to have a better chance of obtaining a conviction.

  **c.**  Directed Hoole to control and direct the criminal prosecution of Danyale.

  **d.**  Cajoled, intimidated and otherwise pressured Hurricane and the other Defendants to allow Hoole, on behalf of ULGT and Hansen, to control the criminal prosecution to obtain the conviction of Danyale and obtain the aforementioned benefits in the Federal Case.

  **e.**  Directed Hurricane and Hoole to inappropriately claim there was some kind of "conflict" in order to justify hiring a new prosecutor that would do their bidding and have a better chance at securing a conviction.

  **f.**  Instructed Hoole to find and hire a "conflicts prosecutor" to take over Danyale's prosecution.

  **g.**  Hired Michael Green as the new "conflicts prosecutor."

  **h.**  Instructed Green not to settle the prosecution because a conviction was needed to undermine Danyale's ongoing Federal Case.

  **i.**  Hoole, at the direction of Defendants, took over more and more of the prosecutor's activities.

  **j.**  Hoole was never qualified or designated as a prosecutor of the Danyale Blackmore Criminal Case, and never made a formal appearance in the case.

  **k.**  At the Trial on January 23 and 24, 2024, Hoole, at the direction and with the approval of Defendants, sat at the counsel table and directed Green on how to prosecute the case.

**l.**      At the Criminal Trial, Hoole, with the direction and approval of Defendants, sat at counsel table with Green, helped pick the jury, helped prepare questioning and jury instructions, gave directions to Green, and gave the closing argument.

242.      These willful and purposeful acts demonstrated Defendants' ulterior purpose in prosecuting the Criminal Case in order to gain advantage and/or dismiss the Federal Case.

243.      At the Criminal Trial, the jury acquitted Danyale of all criminal charges.

244.      Both Vince and Danyale have been damaged by the actions of the Hurricane Defendants and as articulated above.

### FOURTH CAUSE OF ACTION

### ~ *Conspiracy* ~

### *Against Defendants Excell, Billings, Hansen and John and Jane Does 1-10*

### Cognizable Under 42 U.S.C. §1983 and §1988

245.      The allegations contained in all other paragraphs are incorporated herein by reference.

246.      To allege a §1983 civil conspiracy, "a plaintiff must show at least a combination of two or more persons acting in concert and an allegation of a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective." *Frazier v. Evans*, 992 F.3d 1003, 1024 (10th Cir. 2021).

247. The "meeting of the minds" or the "agreement" "must relate to some deprivation of a federally protected right." *Id.* at 1024-25.

248. The Hurricane Defendants, along with ULGT, Hansen, and John and Jane Does, acted in concert with themselves and other Hurricane employees to aggressively prosecute the criminal charges against Danyale in order to deprive Danyale of a federally protected right to be free from prosecution without probable cause and to punish Danyale and Vince for expressing their First Amendment rights.

249. This prosecution without probable cause was done to intimidate the Blackmores for the filing of the Federal Case against Hurricane and the officers and to punish them for constitutionally protected public and private criticism of Defendants.

250. The purpose of ULGT's and Hansen's involvement in directing Hurricane City to aggressively pursue the Criminal Case was to defeat the Federal Case and avoid the risk of paying a §1983 jury award for damages and §1988 attorney fees.

251. The Hurricane Defendants and their employees, along with ULGT and Hansen, determined that although no probable cause existed for Danyale's arrest, the prosecution needed to move forward in order to undermine the ongoing Federal Case.

252. Hurricane Defendants and their employees, along with ULGT and Hansen, agreed together to pursue a course of action that deprived Danyale of the constitutional right to be free from malicious prosecution and abuse of process, and to deprive both Vince and Danyale of the right to be free from retaliation for public speech.

**253.**     The Hurricane Defendants and their employees and agents, along with ULGT and Hansen, entered into a meeting of the minds regarding a course of action that deprived Vince and Danyale of their constitutional rights.

**254.**     Both Vince and Danyale have been damaged by the actions of the Hurricane Defendants and as articulated herein.

## JURY DEMAND

Plaintiffs demand a jury trial on all Causes of Action included herein.

## REQUESTS FOR RELIEF

**WHEREFORE,** Plaintiffs pray judgment against Defendants as follows:

**1.**     For general and compensatory damages in an amount to be determined at trial;

**2.**     For special damages as are shown at trial and as may be allowed by law;

**3.**     For punitive damages against Defendants as may be allowed by law and as are shown at trial;

**4.**     For pre-judgment interest on the damages assessed by the Court, as allowed by law;

**5.**     For Plaintiffs' costs and reasonable attorney fees incurred herein, pursuant to 42 U.S.C. 1988; and as otherwise may be allowed by Utah State or federal law; and,

**6.**     For such other and further relief as the Court deems just and proper.

DATED this 18th day of September, 2024.

**SYKES McALLISTER LAW OFFICES, PLLC**

*/s/ Robert B. Sykes*
ROBERT B. SYKES
C. PETER SORENSEN
CHRISTINA D. ISOM
*Attorneys for Plaintiffs*